Good morning, Your Honors. My name is Mark Mandel. I represent Unilink and the individual to begin and ask to reserve seven minutes for rebuttal. If that's sufficient with you, that's fine. We're going to hold you to your eight minutes. We probably will be a little bit more rigid on the red light then if you've got that much time on reserve. We won't shoot you if you go over, but we'll try to. I'm not wearing a vest. I'm not wearing a gun. Good enough. Okay. Twenty-five years ago, I helped an attorney in California establish the first case on personal liability under the PSJA Trust. The next case was my own case. You mean individual liability? Individual. When you say personal liability. Personal liability for corporate officers and directors. Okay, individual. Right. All right, go ahead. The next one was my case in the Southern District of New York, first reported case of the Zimmerman matter. What's the law and where did the district court run afoul of the law? The law is in this circuit, this court's decision in Mitch Kim, Bear Mountain Mitch Kim, which requires two things. Judge Amber's opinion. Sir? I'm not sir. Judge Amber's opinion. She doesn't even look masculine. She's very feminine. I'm sorry. Yes, that is the opinion, Your Honor. Okay. And it's a two-part test, a two-part requirement. First, the individual must have control over the PSJA Trust assets. Yeah, what are the PSJA assets? Let's go into that. What is the trust? First is the produce that's delivered. Second is the accounts receivable when that produce is sold. Third are any other assets that the licensee acquires. Aren't they both licensees? Pardon? Aren't they both licensees in this case? They are. Oh, okay. And then any assets that are acquired with proceeds of produce. But here it's basically the $1.4 million, isn't it? The $1.4 million was held in Pennsylvania Food Group. That's quite correct, Your Honor. And is there any suggestion that Unilink doesn't have enough money to pay that? Unilink was out of business and ceased operations, Your Honor, before the case was brought. But it sold its stuff to PSJA. Assets. Assets. Sold it all to Seneca. Pennsylvania Food Group was the sole stockholder and controlling entity of Unilink. The Seneca proceeds, the sale proceeds, the net, not the gross, the net. Went to PFG. Went to PFG and was held. Why was PFG dismissed? Do you know? When? Why? Judge, you're going to have to ask Mr. Keaton that because it's a mystery to me. I don't know. If they were here, presumably they'd pay over that money? Absolutely. Why are we here? They were dismissed. And we're here on the imposition of personal liability on the individuals who made sure that those folks, that those assets were held. Well, there was an admission that they, the individuals, had discretionary control. Correct. But actually the district court in a footnote said there was no record evidence as to control, correct? Well, yeah, except there was, on the pretrial statement of facts, I put in that these three fellas had discretionary control. Isn't that enough? It's a little vague. Take Martin out of the case. Forget him. He's gone. Isn't that enough? If they had discretionary control over the entities, isn't that enough? No, Your Honor. That's the first test of Bear Mountain. But then you have to look at what they actually did day-to-day in the sense of control. Even beyond that, Judge. The question is, okay, let's say that these three guys could all sign checks, which they couldn't. Which they could or could not? Pardon? You said which they could or which they could not. No, they could not. Only Mr. Gregory could sign checks. And that's in the record. It's in the trial record, the testimony. Boudarabi was the warehouse manager. He decided what would be packed. All right. So what's the second part of the test that you're? There has to be a breach of fiduciary obligation on the part of the individuals. And what's their fiduciary obligation? To hold the assets pending full payment of the PACA trust. Well, they didn't. They were upstream to another entity over which, you know, they had some control, arguably, but I think there were seven shareholders of that company. I mean, they sent the money. The money went outside the corporation, correct? It went to PFG and was held. See, I have trouble because PFG is its parent. If PFG were its subsidiary, then they would be maintaining control over those assets. But when it goes to its parent and there are other people who have control over that entity, that's taken the money outside of Unilink. The three officers of Unilink were? Minority. Seven shareholders, correct? We're controlling PFG as well. Wait, wait, wait. Weren't there seven shareholders of PFG? Pardon? Weren't there seven shareholders of PFG? You know what, Judge? I can't tell you. I'm not sure. Why do I have that in my record? I have to tell you that I don't have a present recollection of how many there were. Well, it's pretty important because four versus three could control. The other four could control that company. The point was, Judge, that at trial it was established PFG was holding the money, still holding the money, day one of the trial. Well, I don't know if that's the test. But the test might be having to show the actual control by these people, and if it wasn't shown sufficiently under the case law, then you'd win because they didn't show it and they had that obligation, correct? They had an obligation to hold the funds. Are you saying they're not even secondarily liable, that there's no liability to the individuals at all? Why are you here? On day one of the trial, Judge, there was $1.4 million that was freely available to pay the trust claim. In a different entity, though. It's not in the entity that had the PACA obligation. Well, Your Honor, PFG was on the license. They were the controlling, the chief controlling entity. You say they were on the license. They were on the PACA license. The PACA reservation, though, was not in any instrument that the appellate had signed. That language was in the documents flowing between Food Link, Food Team, and Unilink. When Unilink ceased operations, the money had to go somewhere. The proceeds of the sale had to go somewhere. It had to be held. It could have been held in Unilink's bank account. For a company that's not operating, Judge? I think that's stretching it. I think that's stretching it a little bit. There were no claims. There were no liens. There were no encumbrances on the holding company. Actually, it could be a fraudulent concealment to have taken it out of the company. They all knew about it. It was disclosed. Now, let me ask you. This PACA license, what impact does that have, that they were on the PACA license? Well, the entity was disclosed, Your Honor. I don't know what that means. I don't know what that means. You have to answer the question. They were an original defendant in the case. Okay. But tell me about the PACA license. What impact does that have? So they had obligations? It lists the principals of the company who are responsible for maintaining the PACA trust. All right. But was PFG a party to, it was a licensee? Yes. All right. Well, don't, you know, I'm asking. Yes. It was? Okay. No. Thank you. They were the principal and sole stockholder of Unilink on the federal license. Okay. Is the license in the record? Yes. Okay. If you could give me an appendix cite, I'd appreciate it. Sure. I mean, you can do it and then tell us on rebuttal, which you now are facing. I'm. Okay. We'll hear from you on rebuttal. Hold on. Just a moment. Why don't we, because your time is up. Why don't we dig that out while you're on. Dig that out and then you can tell us on rebuttal. Okay. And then when you come back up, you'll notice that. Specifically, what are you appealing? What am I appealing, Your Honor? Yes. The imposition of personal liability on the individuals. You're appealing that? Yes. Okay. That was our thing. You represent the individuals. You represent the individuals. I do. Yes, I do. Okay. Okay. All right. Okay. Thank you. And that helps because I wasn't sure if the other issue was dealing with the attorney's fees, the sanctions, everything else. Yeah. That's for rebuttal, Your Honor. Okay. All right. It's going to be a little more time. Yeah. May it please this honorable court, my name is Michael J. Keaton, and I have the great honor of representing Food Team International. Why don't you just get your money from PFG? Yeah. You're in good shape. We could have, except when we started the trial, you have to keep in mind where we were at the time. The night before Judge Gardner. You're an outlaw. Well, unfortunately. It is unfortunate. But anyway, Judge Gardner, the night before trial entered a summary judgment ruling. One of the things that ruling did is it entered judgment against the corp, Unilink, and it entered judgment against three out of the five individual defendants, including PFG. I'm sorry, excluding PFG. So three out of the five were already on the hook, including Mr. Gregory. Mr. Gregory was. Yeah, but does he have $1.4 million available to pay you? He's the primary control over both entities, both PFG and Unilink. Yeah, but you had a pile of money sitting somewhere. I thought he said Unilink was out of business. Unilink at the time was closed up, yes. So Judge Gardner's view was. Well, let's talk about now. Okay. I mean, go ahead. I just don't understand why entering a summary judgment against them. Well, that's what I was answering. The question is why did we dismiss out PFG? Because PFG was not our buyer. We did not have a direct PACA claim against PFG. But were they on the license? They were on the license, yes. Then they had PACA obligations as well as. They were listed as one of the principles of Unilink as well. But does that mean that they also had the obligations under PACA just like Unilink did? Well, they had the guarantor, if you will, obligations. That's what you had. Kind of a secondary liability. They didn't have the direct liability of being our buyer. So they weren't the trustee of the PACA trust. They were responsible for steering the trustee. Okay, but then they ended up with the money. Yeah, why wouldn't that create a fiduciary obligation? If you're on the license. In our opinion, it was. But one of the things we were trying to do at the beginning of that trial was with Judge Gardner's assistance, was basically saying, like, why do we still need a trial? If you have your judgment against your trustee, your PACA trustee, and you have your judgment against the three guys that were steering the ship. And there's enough money there. I'm sorry? And there's enough money there. Was there enough money? Yeah, that's the problem. Well, you have the ability, because you have your judgment against Unilink and against the three guys steering Unilink, you have the ability to force them to pay you. So why do we need this redundant judgment on PFG? Because they had $1.4 million. That's where the trust is. That's where the department is. The money doesn't need to be about the money. The fact of the matter is. Wait, wait, wait. It's not about the money. What we had already was a judgment against Unilink saying, yes, you have a PACA claim. You have the ability to go and get Unilink's PACA assets wherever they may be. Well, that's the hook. When you say wherever they may be, you knew where they were and you didn't go after them. Well, we knew they were in the pockets of Mr. Gregory. I mean, the fact that it originally came into PFG is almost irrelevant in my view and Judge Gardner's view. Let me clarify this. What is your best authority for the proposition that the liability of the individuals is primary and not secondary and not contingent? Well, actually, I tried that exact argument, funny enough, in this very court in Weisby v. Paglia. And that's when Your Honor was on the bench at the time. And Your Honor said it's not, you know, step one, step two liability, it's joint and several. So the fact of the matter is. I didn't write it. Well, you didn't write it. I'm not sure that. How did you show enough in the record to pass the Bear Mountain Weisby test? Judge Gardner actually entered judgment against the three individuals that we really need, Mr. Gregory and the other two. I know he did, but that's the question. Does that stand? What evidence was there that supports their liability under Weisby and Bear Mountain? There was an admission in the record of all three. As to exactly what, discretionary control? Yeah, as to control over the packet trust assets. But that's not what the case law says. Case law says day-to-day conduct. You have to look exactly. No. No? Okay, what does the case law say? The Bear Mountain case actually says it is the ability to control. That is the touchstone of liability. So that way you cannot avoid liability by just saying, well, I let my partner handle everything. You can't do that. If you had the ability to steer the ship. Point me in Bear Mountain to the language you're relying upon. I'm sorry? Point me in Bear Mountain to the language you're relying upon. In the site for that language. Assess whether the individual's involvement with the corporation established that she was actually able to control the packet trust assets at issue. Able to control. Actually. And that's italicized. Actually able to control. Right. So it's the ability to control. The pleasure had a limited role in operating the corporation. Da-da-da-da-da-da. Right. Not involved in any major business decisions. I mean, don't you have to drill down and really find out whether this person had actually had the ability to control the packet assets? Well, they admitted that. That's what Judge Gardner said. Discretionary control? Judge Gardner found that. So before the trial even started. I know he did. I know he did. We're trying to figure out whether that was right or not. Right. So before the trial even started, we had a finding that they were liable. So all of the evidence that he tried to put in at trial, the defense counsel tried to put in at trial, was irrelevant to the entry of judgment. Well, but he also said in an invoice, I mean, in a footnote, that there's actually no, you know, there's actually no evidence as to the level of their control. Nothing on record establishes the involvement of Mr. Behagel, Mr. Budarabi, Mr. Moore, or PFG in the operations or how they were able to actually exercise control of the packet trust assets. So with that as the conclusion or a finding, how can you say that an admission of discretionary control passes muster? An admission was enough to support the district court judgment at summary judgment stage? But that's on appeal. You're saying admitting that you have the discretionary control is tantamount to, in the language out of Bear Mountain, is what virtually controls assets, followed by the ability to control is core. Ability to control is core. Not the actual exercise of that ability, but the ability to exercise if it were to. But we know nothing about what these people did. We should have brought that up before summary judgment. But the fact is you can't bring up all of these additional facts and evidence after the entry of summary judgment. No, but before summary judgment you have depositions. Before summary judgment you have depositions to prove your case. And I don't see any deposition testimony here that would probe the issues as was done in Bear Mountain. And so I'm saying there is an argument to be made that the record was not sufficient to support what Judge Gardner did. Well, what Judge Gardner had was an admission from the three defendants that he found liable at summary judgment. And what he didn't have was any indication that there was a fact issue as to that ability to control. He relied on the pleading admission. So he has an admission, and he doesn't have any counter evidence to indicate that there is a factual dispute, that we need a trial. So Judge Gardner went and entered summary judgment. He went even further because of all the evidence to re-litigate that issue the defense brought in at trial on the other matters. But we need to determine whether as a matter of law there is enough evidence. I understand that. Well, you have the same record then that Judge Gardner had at the time of summary judgment. Right. What you can't do is Monday morning quarterbacking and saying three or four or five months after summary judgment, when Judge Gardner made this decision, we had all of this evidence come in. Oh, no, you're right. We have to say what did he have at summary judgment, and was it enough? Right, exactly. And what he had was an admission in the record of their control or ability to control, and he didn't have anything to indicate. So none of the stuff that the defense counsel is now bringing to your attention existed when Judge Gardner entered that summary judgment ruling. And Judge Gardner even went so far as to say, look, in his post-trial ruling, he said, look, I understand you spent four days trying to re-litigate the personal liability issue, and I understand there's all this great evidence out there, but the fact is you never brought this to my attention prior to the entry of summary judgment. But how do I understand the secondary liability issue then? Why is it that they are primarily liable? You mentioned Weiss, and you can point me to the language in Weiss. I'll dig through for it now. Why wouldn't it be that they are only secondarily liable? You've got a pile of money there you can satisfy the judgment against, so how would you even get to the individuals? Well, what we don't is have that pot of money. The reason that pot of money is not sitting in Unilink is because of an illegal act. Where is UNLINK? Is that a place? Unilink. Unilink. Sitting in Unilink, the corporation. The Unilink Corporation is the trustee of the Packet Trust, the buyer of our produce. That buyer, we have a judgment on that buyer, and that buyer, that trustee, would be able to pay the judgment that has entered against them now, but for the illegal act of the defendants. The defendants took Unilink's trust assets and parked them in another entity that they control to basically hide them from the creditors of Unilink. Well, you're likening the individuals' acts to the corporate act. I mean, Unilink did do that. And I don't think there's any question that Unilink diverted the assets, et cetera. But the fiduciary obligation, we don't know exactly what these individuals did, you know, themselves. What actually is their individual breach as compared to the corporation's breach? Well, keep in mind, the individuals didn't have a right to that $1.4 million. The only one that had a right to that $1.4 million was Unilink Incorporated. Unilink Incorporated was directed to make those funds payable somewhere else. Those funds should have come into Unilink and been available for Unilink's creditors. Do we know who made the decision to have Unilink do that? No, we don't. Isn't that something that's necessary? I don't think so because there's only a few people that controlled Unilink. Mr. Gregory is, I mean, I think your honors, Judge Rundell, in all due respect, I think your prior question to counsel assumed that the seven shareholders of PFG are all equal shareholders. I think Mr. Gregory is vastly in charge of everything. At PFG? At PFG. Okay, now you're hurting yourself. The other two defendants that we have judgment against are bit players, but they're still steering the ship, so to speak. And then there were – Well, does that help you or hurt you? If we've got the same controlling people at PFG that we have at Unilink, maybe it's really a distinction without a difference. I think it's the gift of all fact patterns. I mean, if this had been paid out to a truly third-party entity – How much money do you want? $1.4 million? No, I think the judgments that are entered in the district court right now that we're asking you to affirm add up to, let's see, it's $104,800, so we'll call it $105,000, plus $47,000, so roughly $200,000. And I'll ask your colleague why he just doesn't have PFG pay you. Well, that was a question we asked long ago. Part of the problem was there was this insurance policy, the Rule 26B issue. Right. That wasn't – The insurance policy was never disclosed early on in the case. We went to two different MAG judge mediations. It was never disclosed. Why do we need an insurance policy if there's $1.4 million sitting somewhere? I don't get it. Well, the insurance policy was there when the risk was much greater than just this issue now. Yeah, but why would you resort to insurance? I mean, if the money disappeared, fine, insurance. Right. You don't need it now. Right. I mean, for the defense to argue that, like, well, you know, we've got all this money over here, so there was no breach of trust. Like, sure there was. You still haven't paid us. The law doesn't require you to just hold the money ad infinitum somewhere, in some third entity even, that you control. What it requires is you hand this over to the beneficiaries, and the beneficiaries that now have a judgment, we're asking you to affirm that judgment. You know, sometimes I see a case that I call them e-mail disputes. Because we're in this age where nobody speaks to anybody. No one really knows anybody. No one picks up the phone. I was just going to say, a district judge told me once. One lawyer picks up the phone, and it gets resolved. It never goes to the phone. It's only money. Only money. A district judge told me once, he goes, doesn't anyone pick up the phone anymore? That's a good question. It's true. We're in the next stage. Well, I doubt it. The sheriff went up on his side. Right. You know, interesting enough, the Rule 26 issue, as long as we're on that point, in the brief, the defendants even said, and I quote, the policy in question was not even in effect during the time of the transactions giving rise to the complaint. Well, it was a claims-made policy. So that's really not there. I understand that. But to represent to this honorable court that that policy that we all know is at issue did not even exist when what they did was they attached a policy declaration page from a re-up, if you will, from the 2009 to 2010 time frame. What I got just this morning, pursuant to a subpoena, is the declarations page from the period of time of these transactions. All right. So there's a lot going on. So clearly the policy that we're all talking about that was hidden for four years was in existence at the time, up until the time of, you know, defense counsel saying. Let me just go back. If you take aside the 26G issue, it goes back to Judge Rendell's question. Why do you care? I thought it was $1.4 million, but if it's $140-some-odd thousand dollars, why do you care about the insurance company going through all that when there's a pot of money sitting there which you say you have legal right to go after? I see my time has expired. May I continue? Yes. Okay. One of the reasons we still care is because of this. Two things, really. One is the judge denied our request for the fee-shifting provision at the summary judgment stage, which we thought was a little early, considering the Third Circuit's statement that you should do this on a case-by-case, fact-intense analysis. So one is we thought it was too early. And two is my client is adamant that they would have conducted this case entirely differently if they knew they were fighting an insurance company with deep pockets. Oh, that's putting the admission. That's an amazing statement. They would have done this altogether differently had they known that they were, that defense counsel was just on this, like, endless, you know, like trough of money. What, did it pay for the file? I don't get that at all. No, not at all. Why is insurance implicated here if there is money available to pay your client? I don't get it. The defense costs? The defense costs go well beyond the judgment, I think. The defense costs, my client would have possibly looked at settlement differently before the MAG judge if he had known he was fighting an endless trough of money. But he knows now. Where are we now? I keep hearing all of this, what happened then. You're here now. What's the situation now? There's money available. What we have now is a judgment against Unilink, our buyer and PACA trustee. Which is worthless. No, I mean, Unilink still has a fraudulent conveyances action that we brought up. Okay, yeah, I agree. The fraudulent conveyances action, if they need to pull that money back without their consent, fine. But with the judgment in place as to Unilink and the three individual defendants, we have the ability to force them, I think, with reasonable minds prevailing, we have the ability to force them to return the money from PFG into Unilink so Unilink can write us a check. Why didn't you keep PFG on the hook and force them to write you a check as the licensee and the guarantor? Because at the time, Judge Gardner saw that the judgment against PFG would be redundant. He's like, look, I already gave you judgment against these three guys and this corp. You have the ability to go get it, so why do we need a trial? And that's when we started kind of chipping away at all the claims. In fact, we agreed to one of their counterclaims for like $4,000 just to avoid a four-day trial. Now, keep in mind, we went through a four-day trial to do nothing other than relitigate the entry of judgment against principals who had admitted control. Well, Mr. Randall saved a good chunk of his time for rebuttal. And I kind of think what I said earlier. Let me hear what Mr. Randall might want to respond with. Thank you, Your Honor. Thank you, Ms. Keenan. To answer Judge Randall's first question about the PACA license, you'll find it in the appendix at page 293. Thank you. And that's where it is. Plaintiff knew in September 2011 where the money was. He did nothing. Well, why didn't you pay him? You've got the money there. Judge, there were disputes over the shipments. There were the whole issue of Okay, so mediate that. It's a matter of money. It's ridiculous. They tried, Your Honor. Right now there are judgments against individuals that you contend shouldn't be there, and there's money to resolve that. Yes, there was. There was? There was. There were attempts. And unless we were going to pay attorney's fees, it went nowhere. Does this whole thing end up to whether? I got it. I got it. We'll decide the attorney's fees issue. Of course, Your Honor. Of course, the attorney's fees are up. There's only included in a couple invoices. That's true. That's true. And they were late in the game, weren't they? Very late in the game, Judge. Since the topic of Rule 26 came up, and I've looked at the case that you asked us to refer to, which is You could say Judge has an independent obligation. Yes. Okay? And the question that I think you asked, if I understood you to refer that, is can you make some determination of a violation of Rule 26 here, or do you have to send it back to the district court? That seemed to be the issue in Livonia. And here's the thing. Under Rule 26, as I understand it, I, as defense counsel, am entitled and obligated to conduct a reasonable inquiry into what's going to be disclosed. Now, in the motion to supplement and my cross-motion, that's before the court. We granted the motion to supplement, didn't we? Yes, you did. And the briefs are there. I'm looking at the briefs now. All right. Here's the thing. The question is, is there a need to be a fact-based inquiry into what I did to determine whether that insurance policy needed to be disclosed, should have been disclosed, may have been disclosed? Well, maybe it should be remanded to the district court for them. I mean, the district court didn't consider it, so. It could be. You can do it here. But I think it's going to be the zero-sum game because we'll probably be right back here. Now, the district court did say, at least informally, or you're alleging or someone's alleging that off the record said, you know, I'm not going to grant sanctions on this. The topic came up. I informed the court that what my investigation with regard to the insurance policy was, that it was all excluded, contract liability, violation of statutes, violation of fiduciary obligation. Everything that was in the complaint was specifically included. Did your opposing colleague ask for sanctions at that point? No. But the district court said, I'm not inclined or there's no way or whatever. That's all it was. Well, and if it goes back, maybe that's what the district court will say, but we don't know that. That we don't, Your Honor. So, you know, if you have to send it back, then you send it back. For some more fun. There's a great episode, Monty Python's Bureau of Arguments, and I don't know if you've ever seen that episode, but if you get a chance, Google Monty Python's Bureau of Arguments, We're running up against it. Rule 26 is not, it requires discretion. We could, if we wanted to, and I suppose the court can, simply pick out the May language that's there and just say disclose all insurance policies. Is there a legitimate argument as to the amount at issue? There is, Your Honor. I mean, they said, he said yes to interest and no to attorney's fees. What's the highest and the lowest, what's the range here of what we're talking about? You say X dollars is due, they say Y dollars. Principal amount was about $27,000. Okay. And if you look in the brief, it was charted to the district court. Okay, so attorney's fees, interest, everything. When you add up all the payments and you add up all the extra money that plaintiff received in reselling the rejected commodities. Yeah, who would buy them, by the way? Who was what? Who would buy the rejected that supposedly had worms in them? Well, they didn't. Yeah, well. Well, there was no evidence that they did. Unilink lost that counterclaim because they didn't do it right. They didn't get federal inspections on the commodities. They should have. All right, let's get back to the numbers. There's $27,000 on the line. So it's $27,000 in principal, and then the question is, is there an interest provision that was sent to Unilink seven months after the contract was negotiated and some 22 invoices were barren? Some of them were. Were there two invoices? There were the last two, the last two shots. So what's the high on the high end? Your colleague says close to $200. From the standpoint of the amount that is due for when you add up the payments and the contract damages, it's about $26,000. Now, Judge Gardner asked for or said $105,000. And that's what he did. We don't think that that can be maintained on personal liability. And the evidence that came in at trial with regard to how much was actually owed netted out to be about $27,000. So that's where it sits. And, of course... And the legal issue on that... Is there legal issues in a case like this? The legal issue is one interest and two attorney's fees. Is that right? Is there anything else of issue? Other than that, no, Your Honor, and the standard for imposing personal liability. Last thing, would you seek counsel for... I see my time is up, Judge, so... Thank you very much for your arguments. Could we just seek counsel for a second? Mr. Keating, can you join us and Mr. Mendo? Thank you. Come on up, Bill. Bingo.